## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Allina Health Systems Plaintiffs: | Court File No. 21-CV-2127 |
| Mary Roe 1; John Doe 1; Mary Roe 2; Mary Roe 3; Mary Roe 4; Mary Roe 5; Mary Roe 6; Mary Roe 7; Mary Roe 8; Mary Roe 9; Mary Roe 10; Mary Roe 11; Mary Roe 12; John Doe 2; Mary Roe 13; Mary Roe 14; Mary Roe 15; Mary Roe 16; Mary Roe 17; John Doe 3; Mary Roe 18; John Doe 4; Mary Roe 19; Mary Roe 20; Mary Roe 21; Mary Roe 22; Mary Roe 23; Mary Roe 24; Mary Roe 25; Mary Roe 26; John Doe 5; John Doe 6; Mary Roe 27; Mary Roe 28; Mary Roe 29; Mary Roe 30; Mary Roe 31; Mary Roe 32; Mary Roe 33; John Doe 7; Mary Roe 34; Mary Roe 35; Mary Roe 36; John Doe 8; Mary Roe 37; Mary Roe 38; Mary Roe 39; John Doe 9; Mary Roe 40; Mary Roe 41; Mary Roe 42; Mary Roe 43; John Doe 10; Mary Roe 44; Mary Roe 45; Mary Roe 46; Mary Roe 47; Mary Roe 48; Mary Roe 49; Mary Roe 50; John Doe 11; Mary Roe 51; John Doe 12; Mary Roe 52; Mary Roe 53; Mary Roe 54; Mary Roe 55; Mary Roe 56; John Doe 13; Mary Roe 57; | **CORRECTED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |
| Carris Health System Plaintiff: | |
| Mary Roe 58; | |
| CentraCare Plaintiffs: | |
| Mary Roe 59; Mary Roe 60; Mary Roe 61; Mary Roe 62; Mary Roe 63; Mary Roe 64; Mary Roe 65; Mary Roe 66; | |

1

Children's Health Care Plaintiffs:  Mary
Roe 67; Mary Roe 68; Mary Roe 69; Mary
Roe 70;

Essentia Health Plaintiffs: Mary Roe 71;
John Doe 14; Mary Roe 72; John Doe 15;
Mary Roe 73; Mary Roe 74; Mary Roe 75;
Mary Roe 76; Mary Roe 77; Mary Roe 78;

Gillette Children's Specialty Healthcare
Plaintiffs: Mary Roe 79; John Doe 16; Mary
Roe 80; Mary Roe 81; Mary Roe 82;

Group Health Plan, Inc. Plaintiffs: Mary
Roe 83; Mary Roe 84; Mary Roe 85; Mary
Roe 86; Mary Roe 87; Mary Roe 88; Mary
Roe 89; Mary Roe 90; Mary Roe 91; Mary
Roe 92; Mary Roe 93; John Doe 17; Mary
Roe 94; Mary Roe 95; Mary Roe 96; Mary
Roe 97; Mary Roe 98; Mary Roe 99; Mary
Roe 100; Mary Roe 101; Mary Roe 102;
Mary Roe 103; Mary Roe 104; Mary Roe
105; Mary Roe 106; Mary Roe 107; Mary
Roe 108;

M Health Fairview Plaintiffs:  Mary Roe
109; John Doe 18; John Doe 19; John Doe
20; John Doe 21; Mary Roe 110; Mary Roe
111; Mary Roe 112; Mary Roe 113; Mary
Roe 114; Mary Roe 115; Mary Roe 116;
Mary Roe 117; Mary Roe 118; Mary Roe
119; Mary Roe 120; Mary Roe 121; Mary
Roe 122; Mary Roe 123; Mary Roe 124;
John Doe 22; John Doe 23; Mary Roe 125;
John Doe 24; Mary Roe 126; Mary Roe 127;
Mary Roe 128; Mary Roe 129; Mary Roe
130; Mary Roe 131; John Doe 25; John Doe
26; Mary Roe 132; Mary Roe 133; Mary
Roe 134; Mary Roe 135; Mary Roe 136;
Mary Roe 137; Mary Roe 138; Mary Roe
139; Mary Roe 140; Mary Roe 141; Mary
Roe 142; John Doe 27; Mary Roe 143; Mary

2

Roe 144; Mary Roe 145; Mary Roe 146;
Mary Roe 147; Mary Roe 148; Mary Roe
149; Mary Roe 150; Mary Roe 151; Mary
Roe 152; Mary Roe 153; Mary Roe 154;

Mayo Clinic Plaintiffs;  John Doe 28; John
Doe 29;

Minneapolis Radiation Oncology Plaintiff:
Mary Roe 155;

North Memorial Health Care Plaintiff: Mary
Roe 156;

Northfield Hospital & Clinics Plaintiff:
Mary Roe 157;

St. Luke's Hospital System Plaintiffs: Mary
Roe 158; John Doe 30;

*Plaintiffs*,

*vs*

Allina Health System; Affiliated
Community Medical Centers, Ltd.; Carris
Health - Redwood, LLC; Group Health
Plan, Inc.; Children's Health Care;
ESSENTIA HEALTH; St. Mary's Duluth
Clinic Health System; CentraCare Health
System; Fairview Health Services; Fairview
Physician Associates Network; Gillette
Children's Specialty Health Care; SMDC
Medical Center; Regions Hospital;
University of Minnesota Physicians; Mayo
Clinic; North Memorial Health Care; Park
Nicollet Methodist Hospital; St. Luke's
Hospital of Duluth; Minneapolis Radiation
Oncology, P.A.; Lakeview Memorial

Hospital Association, Inc.; XAVIER
BECERRA, in his official capacity as
Secretary of the United States Department
of Health and Human Services, UNITED
STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, ROCHELLE P.
WALENSKY, MD, MPH, in her official
capacity as Director of the Center for
Disease Control and Prevention, CENTER
FOR DISEASE CONTROL AND
PREVENTION, CENTERS FOR
MEDICARE & MEDICAID SERVICES,

*Defendants.*

The Plaintiffs make the following allegations for their complaint against the
Defendants.

## INTRODUCTION

1.      This civil action for declaratory and injunctive relief arises under the 42
U.S.C. §2000bb (the Religious Freedom Restoration Act ("RFRA")), 42 U.S.C. §1983
(violation of Plaintiffs' First Amendment's Free Exercise Rights), 21 U.S.C. §360bbb-3
(the federal Emergency Use Authorization Act), 42 U.S.C. §12101 (the Americans with
Disabilities Act), Minn. Stat. §363A.01 (the Minnesota Human Rights Act) and Minn.
Stat. §12.39 (Minnesota's Refusal of Treatment Law).

2.      This action concerns the legality of Defendants' Fairview Health Services,
Affiliated Community Medical Centers, Ltd.; Carris Health - Redwood, LLC; Group
Health Plan, Inc.; Gillette Children's Health Care; Essentia Health; St. Mary's Duluth

Clinic Health; Centracare Health System; Fairview Health Services; Fairview Physician Associates Network; SMDC Medical Center; Regions Hospital; University Of Minnesota Physicians; Mayo Clinic; North Memorial Health Care; Park Nicollet Methodist Hospital; St. Luke's Hospital Of Duluth; and Minneapolis Radiation Oncology, P.A. (hereinafter referred to collectively as the "Healthcare Defendants") COVID-19 Vaccine Mandate Policies (hereinafter referred to as "Vaccine Mandate Policies") which require that all employees receive one of the available COVID-19 vaccines. Plaintiffs who refuse to abide by the Vaccine Mandates Policies are threatened with termination or disparate treatment that is worse than employees who have received the COVID-19 vaccination.

3.      These Vaccine Mandate Policies have come about nearly three months after Governor Walz ended the Peacetime Emergency Powers on June 30, 3021.

4.      The Vaccine Mandate Policies are the result of rules adopted by Defendant Health and Human Services ("HHS") incorporating the Centers for Disease Control's ("CDC") Measure Specification. Fed. Reg. 2021/05/10/2021-08888 and CDC Measure Specification: NHSN Covid-19 Vaccination Coverage Updated August 21 2021. (collectively, "CDC Measure Specification").

5.      The CDC Measure Specification requires that certain health care employers, in order to successfully participate in federal subsidies, report to HHS on the "the percentage of healthcare personnel (HCP) who receive a complete COVID-19 vaccination course." As more fully described below, placing religious objectors and Covid-19-recovered employees in the denominator creates a negative impact on the

federal subsidies the Health Care Defendants receive and depend on for their financial health and continued operations.

6.      This federal rule creates incentives for the Health Care Defendants to require vaccination, regardless of religious or other objections, Minnesota state law, or the immunity status of employees who may have already had Covid-19 and who therefore possess natural immunity superior to the immunity conferred by the vaccines.

7.      As a result, the Plaintiff employees are experiencing a substantial burden on their religious practice and their rights under federal and state law because the CDC Measure Specification requires their employers to include them in the denominator for the purposes of reporting to the employers' employee vaccination rate to the HHS and thereby affects the amount their employers are paid by CMS.

8.      Based on the CDC Measure Specification, Plaintiffs' employers are placing a substantial burden on their employees not to practice their-religious-based objection to the Covid-19 vaccination, or live under the threat of having their religious exemption withdrawn at any time.

9.      The Plaintiff employees seek declaratory and injunctive relief from the operation of the final rules promulgated by the HHS and CDC because those rules violate RFRA which requires that the CDC Measure Specification not include religious objectors in the denominator for the purposes of employer's calculations of employee vaccination rates.

10.      For similar reasons, the final rules the HHS and CDC promulgated violate the Plaintiffs' First Amendment Free Exercise Clause rights.

6

11.     The Health Care Defendants' Vaccine Mandate Policies also violate the

Plaintiff employees' rights under Minn. Stat. § 12.39 which states:

> "… individuals have a fundamental right to refuse medical treatment, testing,
> physical or mental examination, vaccination, participation in experimental
> procedures and protocols, …".  *Subd. 1.*

> Further, "before performing … vaccination of an individual … a health care
> provider shall notify the individual of the right to refuse the … vaccination …".
> *Subd. 2*.

12.     The Health Care Defendants' policies also violate the Emergency Use

Authorization statute, 21 U.S.C. § 360bbb-3, which explicitly states that anyone to whom

the product (the vaccines in this case) is administered must be informed of the option to

accept or to refuse it, as well as the alternatives to the product and the risks and benefits

of receiving it.

13.     In July, August, and September 2021, the Health Care Defendants issued

Covid-19 Vaccine Mandate Policies for their employees, stripping their employees of

their rights both under federal and state law.

14.     The Vaccine Mandates Policies require that the Plaintiff employees submit

to vaccination of one of the Covid-19 vaccines, or they will be terminated or placed on

unpaid administrative leave.

15.     The Health Care Defendants' Vaccine Mandate Policies are the direct

consequence of HHS action.

16.     The Plaintiffs are currently being impermissibly coerced to violate their

religious beliefs and their rights under federal and state law.  The Plaintiff employees will

continue to be harmed by loss of employment and professional standing, as well as the

denial of their constitutional and statutory rights, unless this Court provides them their requested relief from the Defendants' illegal Vaccine Mandate Policies.

17.     Finally, the Defendant employers' implementation of the Vaccine Mandate Policies also violates the Plaintiffs' employment rights under the Americans with Disabilities Act and the Minnesota Human Rights Act.

## PARTIES

18.     The Plaintiffs are health care personnel employed by the Health Care Defendants or persons who require access to the Health Care Defendants facilities in order to make their living.  The Plaintiffs are subject to the Health Care Defendants' Vaccine Mandate Policies.  The Health Care Defendants' Vaccine Mandate Policies are caused by the CDC Measure Specification's vaccination calculations which deny religious exemptions.  The Plaintiff employees include some whose sincere religious beliefs compel them to refuse vaccinations with the available Covid-19 vaccines, all of which employ aborted fetus cell lines in their testing, development, or production.  The Vaccine Mandate Policies are forcing the Plaintiff employees to either to be vaccinated or to be terminated or to suffer other workplace discipline and discriminatory treatment. The Plaintiff employees are experiencing a substantial burden on their religious practice because the CDC Measure Specification requires their employers to include them in the denominator for the purposes of reporting to the employers' employee vaccination rate to the HHS.

19.     The Plaintiff employees also include:

  a. employees who possess robust natural immunity following a Covid-19 infection and the employee's recovery;

  b. employees who have a religious objection to subjecting themselves to a vaccine that was made with, or tested with aborted baby cells, or other religious objection to the vaccines;

  c. employees who object to the vaccine because given their age and health they are unwilling to risk taking a vaccine that has known side effects which are serious;

  d. pregnant employees or those who may become pregnant and suffer side effects from the vaccines, which were not tested on pregnant women; and

  e. some employees have sought and obtained a religious exemption that is threatened to be terminated at any time, while others have sought the religious exemption but were denied it.

 20. Mary Roe-1 is a Minnesota Resident and a Nurse employed in the Allina Health System. She has not tested positive for Covid-19. She submitted a religious exemption request to Allina Health and it was approved.

 21. John Doe-1 is a Minnesota resident and a staff personnel with Allina Health. He tested positive for the Covid-19 virus. He submitted a religious exemption request to Allina Health and it was approved.

 22. Mary Roe-2 is a Minnesota resident and a doctor with Allina Health. She has requested a religious exemption which has not yet been granted. She has tested positive for the Covid-19 virus.

 23. Mary Roe-3 is a Minnesota resident and is a nurse with Allina Health. She has requested a religious exemption which has not yet been granted. She has tested negative for the Covid-19 virus.

24.     Mary Roe-4 is a Wisconsin resident and a nurse for Allina Health.  She has requested a religious exemption which has not yet been granted.  She has tested negative for the Covid-19 virus.

25.     Mary Roe-5 is a Minnesota resident and staff personnel for Allina Health. Ms. Roe-5 requested a religious exemption request with Allina Health, which the health system granted. She has tested positive for the Covid-19 virus.

26.     Mary Roe-6 is a Minnesota resident and is a nurse employed by the Allina Health System.  She has tested negative for Covid-19. She submitted a religious exemption request to Allina Health, which the health system granted.

27.     Mary Roe-7 is a Wisconsin resident and an oncology dietician for Allina Health.  She has requested a religious exemption which has not yet been granted.  She has tested negative for Covid-19.

28.     Mary Roe-8 is a Minnesota resident and a nurse for Allina Health.  She has requested a religious exemption which has not been granted or denied yet.  She has tested negative for Covid-19.

29.     Mary Roe-9 is a Minnesota resident and is staff personnel for Allina Health.  She has requested a religious exemption from the Allina Health System, which the health system granted.  She has tested negative for Covid-19.

30.     Mary Roe-10 is a Minnesota resident and is a Massage Therapist employed by the Allina Health System.  She has requested a religious exemption through the Allina Health System, which the health system granted.  She has tested positive for Covid-19.

31.     Mary Roe-11 is a Minnesota resident and is employed as Technology Personnel by the Allina Health System. She requested a religious exemption through the Allina Health System which has yet to be granted. She has tested positive for Covid-19.

32.     Mary Roe-12 is a Minnesota resident and is employed as Technology Personnel by the Allina Health System. She has requested a religious exemption through the Allina Health System, which the health system granted. She tested negative for Covid-19.

33.     John Doe-2 is a Minnesota resident and is employed as a patient accounts resolution specialist by the Allina Health System.  He requested a religious exemption through the Allina Health System, which has yet to be granted. He has tested negative for Covid-19.

34.     Mary Roe-13 is a Minnesota resident and is employed as a Peri Operative Aide by the Allina Health System.  She requested a religious exemption through the Allina Health System, which has yet to be granted. She has tested negative for Covid-19.

35.     Mary Roe-14 is a Minnesota resident and is employed as Technology Personnel by the Allina Health System.  She has requested a religious exemption through the Allina Health System, which the health system granted.  She has tested negative for Covid-19.

36.     Mary Roe-15 is a Minnesota resident and is employed as Technology Personnel by the Allina Health System. She has requested a religious exemption through the Allina Health System, which the health system granted.  She has tested negative for Covid-19.

37.     Mary Roe-16 is a Minnesota resident and is employed as a Diagnostic Medical Stenographer by the Allina Health System.  She has requested a religious exemption through the Allina Health System, which the health system granted.  She has tested negative for Covid-19.

38.     Mary Roe-17 is a Minnesota resident and is employed as a physical therapist by the Allina Health System.  She has requested a religious exemption through the Allina Health System, which has yet to be granted by the health system.  She has tested negative for Covid-19.

39.     John Doe-3 is a Wisconsin resident who is employed as a Nurse by the Allina Health System.  He has requested a religious exemption through the Allina Health System, which the health system granted.  He has tested positive for Covid-19.

40.     Mary Roe-18 is a Minnesota resident employed as a Nurse by the Allina Health System. She has requested a religious exemption through the Allina Health System, which the health system granted.  She has tested negative for Covid-19.

41.     John Doe-4 is a Minnesota resident and is employed as Technology Personnel by the Allina Health System.  He has requested a religious exemption through the Allina Health System, which has yet to be granted by the health system.  He has tested negative for Covid-19.

42.     Mary Roe-19 is a Minnesota resident and is employed as a Nurse for the Allina Health System.  She has requested a religious exemption which has been neither granted nor denied.  She tested negative for Covid-19.

43.     Mary Roe-20 is a Minnesota resident and is employed as a Nurse by the Allina Health System.  She tested positive for Covid-19 virus.

44.     Mary Roe-21 is a Minnesota resident and is employed as a Nurse by the Allina Health System.  She has requested a religious exemption which has been neither granted nor denied.  She has tested negative for Covid-19.

45.     Mary Roe-22 is a Minnesota resident and is employed as cardiac stenographer by the Allina Health System.  She has requested a religious exemption from the Allina Health System which has been granted.  She has tested negative for Covid-19.

46.     Mary Roe-23 is a Minnesota resident and is employed as a Physician by the Allina Health System. She has requested a religious exemption from the Allina Health System which has been granted.  She has tested negative for Covid-19.

47.     Mary Roe-24 is a Minnesota resident and is employed as a nurse by the Allina Health System.  She has requested a religious exemption which has been neither granted nor denied.  She tested negative for Covid-19.

48.     Mary Roe-25 is a Minnesota resident and is employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System. The exemption has neither been granted nor denied. She has tested negative for Covid-19.

49.     Mary Roe-26 is a Minnesota resident and is a nurse for Allina Health.  She has requested a religious exemption which has been neither granted nor denied.  She has tested negative for Covid-19.

50.     John Doe-5 is a Wisconsin resident and is employed as staff personnel by the Allina Health System.  He has requested a religious exemption which has been neither granted nor denied yet.  He has tested positive for Covid-19.

51.     John Doe-6 is a Minnesota resident and employed as a Nurse by the Allina Health System. He has requested a religious exemption from the Allina Health System which has yet to be granted.  He has tested positive for Covid-19.

52.     Mary Roe-27 is a Minnesota resident and employed as a Nurse by the Allina Health System. She has requested a religious exemption from the Allina Health System which has been granted.  She has tested negative for Covid-19.

53.     Mary Roe-28 is a Minnesota resident and employed as a Technician for the Allina Health System.  She has requested a religious exemption which was granted.  She has tested negative for Covid-19.

54.     Mary Roe-29 is a Minnesota resident and employed as a surgical technologist by the Allina Health System. She has requested a religious exemption from the Allina Health System which has yet to be granted.  She tested negative for Covid-19.

55.     Mary Roe-30 is a Minnesota resident and employed as a nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

56.     Mary Roe-31 is a Minnesota resident and employed as a Surgical Technologist by the Allina Health System. She requested a religious exemption from the Allina Health System which has yet to be granted. She tested negative for Covid-19.

57.     Mary Roe-32 is a Minnesota resident and employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

58.     Mary Roe-33 is a Minnesota resident and employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested positive for Covid-19.

59.     John Doe-7 is a Minnesota resident and employed as a Technologist by the Allina Health System. He requested a religious exemption from the Allina Health System which has yet to be granted. He tested negative for Covid-19.

60.     Mary Roe-34 is a Minnesota resident and employed as a Nurse by the Allina Health System.  She requested a religious exemption from the Allina Health System which has yet to be granted. She tested positive for Covid-19.

61.     Mary Roe-35 is a Minnesota resident and employed as a Pharmacist by the Allina Health System. She requested a religious exemption which has neither been granted nor denied yet.  She tested negative for Covid-19.

62.     Mary Roe-36 is a Minnesota resident and employed as a nurse by the Allina Health System.  She has requested a religious exemption which has been granted.  She tested negative for Covid-19.

63.     John Doe-8 is a Minnesota resident employed as a Physician by the Allina Health System. He requested a religious exemption which has neither been granted nor denied yet.  He tested negative for Covid-19.

15

64.     Mary Roe-37 is a Minnesota resident employed as a Nurse by the Allina Health System. She requested a religious exemption which has neither been granted nor denied yet.  She tested negative for Covid-19.

65.     Mary Roe-38 is a Minnesota resident employed as a Nurse by the Allina Health System. She requested a religious exemption which has neither been granted nor denied yet.  She tested negative for Covid-19.

66.     Mary Roe-39 is a Minnesota resident and employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested positive for Covid-19.

67.     John Doe-9 is a Minnesota resident and employed as a Nurse by the Allina Health System.  He has requested a religious exemption which has been granted.  He tested positive for Covid-19.

68.     Mary Roe-40 is a Minnesota resident and employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

69.     Mary Roe-41 is a Minnesota resident and employed as a Nurse by the Allina Health System.  She tested negative for Covid-19.

70.     Mary Roe-42 is a Minnesota resident and employed as a Nurse by the Allina Health System. She requested a religious exemption which was granted.  She tested positive for Covid-19.

71.     Mary Roe-43 is a Minnesota resident and employed as an Obstetrics Technician by the Allina Health System.  She requested areligious exemption which has been neither granted nor declined.  She tested negative for Covid-19.

72.     John Doe-10 is a Minnesota resident and employed as a nurse by the Allina Health System.  He requested a religious exemption which has been neither granted nor declined.  He tested negative for Covid-19.

73.     Mary Roe-44 is a Minnesota resident and employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

74.     Mary Roe-45 is a Minnesota resident and employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

75.     Mary Roe-46 is a Minnesota resident and employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

76.     Mary Roe-47 is a Minnesota resident and employed as a Nursing Support Coordinator for the Allina Health System.  She requested a religious exemption which has not yet been granted.  She has tested negative for Covid-19.

77.     Mary Roe-48 is a Minnesota resident and employed as a Special Imaging Technologist by the Allina Health System. She requested a religious exemption which has not yet been granted.  She has tested negative for Covid-19.

78.     Mary Roe-49 is a Wisconsin resident employed as a Nurse by the Allina Health System. She requested a religious exemption which has been neither granted nor denied yet.  She tested positive for Covid-19.

79.     Mary Roe-50 is a Minnesota resident employed as a Technologist by the Allina Health System. She requested a religious exemption which has not yet been granted.  She tested negative for Covid-19.

80.     John Doe-11 is a Minnesota resident employed as staff by the Allina Health System. He requested a religious exemption which has not yet been granted.  He tested positive for Covid-19.

81.     Mary Roe-51 is a Minnesota resident employed as a Nurse by the Allina Health System.  She has requested a religious exemption which has been neither granted nor denied.  She has tested negative for Covid-19.

82.     John Doe-12 is a Minnesota resident employed as a Nurse by the Allina Health System. He requested a religious exemption from the Allina Health System which was granted. He tested positive for Covid-19.

83.     Mary Roe-52 is a Minnesota resident employed as Staff by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

84.     Mary Roe-53 is a Minnesota resident employed as a Nurse by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

85.     Mary Roe-54 is a Wisconsin resident employed in Environmental Sciences by the Allina Health System.  She requested a religious exemption which has neither been granted nor denied.  She tested positive for Covid-19.

86.     Mary Roe-55 is a Wisconsin resident employed as a Licensed Massage Therapist by the Allina Health System.  She requested a religious exemption which has neither been granted nor denied.  She tested positive for Covid-19.

87.     Mary Roe-56 is a Minnesota resident employed as Staff by the Allina Health System. She requested a religious exemption from the Allina Health System which was granted. She tested negative for Covid-19.

88.     John Doe-13 is a Wisconsin resident employed as a Physician by the Allina Health System. He requested a religious exemption from the Allina Health System which has been neither granted nor denied.  He tested positive for Covid-19.

89.     Mary Roe-57 is a Minnesota resident employed by the Allina Health System. She tested negative for Covid-19.

90.     Mary Roe-58 is a Minnesota Resident employed as a Technologist by Carris Health System. She requested a Religious Accommodation from Carris Health System, which has yet to respond. She tested negative for Covid-19.

91.     Mary Roe-59 is a Minnesota resident employed as a Nurse by Centracare. She tested negative for Covid-19.

92.     Mary Roe-60 is a Minnesota resident employed as a Nurse by CentraCare. She has requested a religious exemption from CentraCare, which has neither been granted nor denied. She tested negative for Covid-19.

19

93.     Mary Roe-61 is a Minnesota resident employed as a Technician by CentraCare.  She has requested a religious exemption from CentraCare, which has been neither granted nor denied.  She has tested positive for Covid-19.

94.     Mary Roe-62 is a Minnesota resident employed as a Technician by CentraCare.  She has requested a religious exemption from CentraCare, which has been neither granted nor denied.  She has tested negative for Covid-19.

95.     Mary Roe-63 is a Minnesota resident employed as a Nurse by CentraCare. She has requested a religious exemption from CentraCare, which has been neither granted nor denied.  She has tested negative for Covid-19.

96.     Mary Roe-64 is a Minnesota resident employed as a Nurse by CentraCare. She has requested a religious exemption from CentraCare, which has been neither granted nor denied.  She has tested negative for Covid-19.

97.     Mary Roe-65 is a Minnesota resident employed as a Nurse by CentraCare. She has requested a religious exemption from CentraCare, which has been neither granted nor denied.  She has tested positive for Covid-19.

98.     Mary Roe-66 is a Minnesota resident employed as a Nurse by CentraCare. She has requested a religious exemption from CentraCare, which has been neither granted nor denied.  She has tested negative for Covid-19.

99.     Mary Roe-67 is a Minnesota resident employed as a Nurse by Children's Hospital. She has requested a religious exemption from Children's Hospital which has neither been granted nor denied.  She has tested negative for Covid-19.

20

100.    Mary Roe-68 is a Minnesota resident employed as a Nurse by Children's Hospital. She has requested a religious exemption from Children's Hospital which has neither been granted nor denied.  She has tested negative for Covid-19.

101.    Mary Roe-69 is a Minnesota resident employed as a Nurse by Children's Hospital. She has requested a religious exemption from Children's Hospital which has neither been granted nor denied.  She has tested negative for Covid-19.

102.    Mary Roe-70 is a Minnesota resident employed as a Nurse by Children's Hospital. She has requested a religious exemption from Children's Hospital which has neither been granted nor denied.  She has tested negative for Covid-19.

103.    Mary Roe-71 is a Minnesota resident employed as a Nurse by EssentiaHealth. She has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  She tested negative for Covid-19.

104.    John Doe-14 is a Wisconsin resident employed as a Nurse by EssentiaHealth. He has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  He tested positive for Covid-19.

105.    Mary Roe-72 is a Minnesota resident employed as a Nurse by EssentiaHealth. She has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  She tested positive for Covid-19.

106.    John Doe-15 is a Minnesota resident employed as a Physician for EssentiaHealth.  He has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  He tested positive for Covid-19.

107.    Mary Roe-73 is a Minnesota resident employed as Staff by EssentiaHealth. She has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  She tested positive for Covid-19.

108.    Mary Roe-74 is a Minnesota resident employed as a Nurse by EssentiaHealth. She has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  She tested positive for Covid-19.

109.    Mary Roe-75 is a Minnesota resident employed as a Nurse by EssentiaHealth. She has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  She tested negative for Covid-19.

110.    Mary Roe-76 is a Minnesota resident employed as a Nurse by EssentiaHealth. She has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  She tested negative for Covid-19.

111.    Mary Roe-77 is a Minnesota resident employed as a Nurse by EssentiaHealth. She has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  She tested negative for Covid-19.

112.    Mary Roe-78 is a Minnesota resident employed as a Technologist by EssentiaHealth. She has requested a religious exemption from EssentiaHealth which has neither been granted nor denied.  She tested positive for Covid-19.

113.    Mary Roe-79 is a Minnesota resident employed as a Nurse for Gillette Children's Hospital. She has requested a religious exemption from Gillette Children's Hospital which has neither been granted nor denied.  She tested positive for Covid-19.

114.    John Doe-16 is a Minnesota resident employed as Staff by Gillette Children's Hospital. He has requested a religious exemption from Gillette Children's Hospital which has neither been granted nor denied.  He tested negative for Covid-19.

115.    Mary Roe-80 is a Minnesota resident employed as a Technologist by Gillette Children's Hospital. She has requested a religious exemption from Gillette Children's Hospital which has neither been granted nor denied.  She tested negative for Covid-19.

116.    Mary Roe-81 is a Minnesota resident employed as an Administrative Assistant by Gillette Children's Hospital. She has requested a religious exemption from Gillette Children's Hospital which has neither been granted nor denied.  She tested negative for Covid-19.

117.    Mary Roe-82 is a Minnesota resident employed as a Nurse by Gillette Children's Hospital. He has requested a religious exemption from Gillette Children's Hospital which has neither been granted nor denied.  He tested positive for Covid-19.

118.    Mary Roe-83 is a Minnesota resident that works as a Nurse for Group Health Plan, Inc.  She has requested a religious exemption which has neither been granted or denied.  She has tested negative for Covid-19.

119.    Mary Roe-84 is a Minnesota resident that works as a Nurse for Group Health Plan, Inc.  She has requested a religious exemption which has neither been granted or denied.  She has tested negative for Covid-19.

120. Mary Roe-85 is a Minnesota resident that works as a Nurse for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted or denied. She has tested positive for Covid-19.

121. Mary Roe-86 a nurse and Minnesota resident. She has requested a religious exemption which has neither been granted nor denied at this time. She has tested negative for Covid-19.

122. Mary Roe-87 is a Minnesota resident employed as a Nurse for Group Health Plan, Inc. She requested a religious exemption from Group Health Plan, Inc. which has neither been granted nor denied at this time. She tested positive for Covid-19.

123. Mary Roe-88 is a Wisconsin resident who works as a technician for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted nor denied at this time. She has tested negative for Covid-19.

124. Mary Roe-89 is a Wisconsin resident who works as a nurse for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted nor denied at this time. She has tested negative for Covid-19.

125. Mary Roe-90 is a Minnesota resident who works as a technician for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted nor denied at this time. She has tested negative for Covid-19.

126. Mary Roe-91 is a Minnesota resident who works as a nurse for Group Health Plan, Inc. She has filed a religious exemption which has neither been granted or denied at this time. She has tested positive for Covid-19.

24

127. Mary Roe-92 is a Wisconsin resident who works as a nurse for Group Health Plan, Inc. She requested a religious exemption which has neither been granted nor denied at this time. She has tested negative for Covid-19.

128. Mary Roe-93 is a Minnesota resident who works as a physical therapist for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted nor denied at this time. She has tested negative for Covid-19.

129. John Doe-17 is a Minnesota resident who works as a technician for Group Health Plan, Inc. He has requested a religious exemption which has neither been granted nor denied at this time. He has tested negative for Covid-19.

130. Mary Roe-94 is a Minnesota resident who works as a nurse for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted nor denied at this time. She has tested negative for Covid-19.

131. Mary Roe-95 is a Minnesota resident that works as a Nurse for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted or denied. She has tested negative for Covid-19.

132. Mary Roe-96 is a Minnesota resident that works as a Nurse for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted or denied. She has tested negative for Covid-19.

133. Mary Roe-97 is a Minnesota resident who works as a nurse for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted nor denied at this time. She has tested positive for Covid-19.

134.    Mary Roe-98 is a Minnesota resident and staff member.  She has requested a religious exemption which has neither been granted nor denied at this time.  She has tested negative for Covid-19.

135.    Mary Roe-99 is a Wisconsin resident who works as a Staff person for Group Health Plan, Inc.  She has requested a religious exemption which has neither been granted or denied.  She has tested negative for Covid-19.

136.    Mary Roe-100 is a Minnesota resident who works as a nurse for Group Health Plan, Inc.  She has requested a religious exemption which has been neither granted nor denied at this time.  She has tested negative for Covid-19.

137.    Mary Roe-101 is a Minnesota resident who works as a nurse for Group Health Plan, Inc.  She has requested a religious exemption which has neither been granted nor denied at this time.  She has tested negative for Covid-19.

138.    Mary Roe-102 is a Minnesota resident who works as a nurse for Group Health Plan, Inc.  She has requested a religious exemption which has neither been granted nor denied at this time.  She has tested negative for Covid-19.

139.    Mary Roe-103 is a Wisconsin resident who works for Group Health Plan, Inc. She has requested a religious exemption which has neither been granted or denied at this time.  She has tested negative for Covid-19.

140.    Mary Roe-104 is a Wisconsin resident who works as a Technician for Group Health Plan, Inc.  She has requested a religious exemption and it has been denied. She has tested positive for Covid-19.

141.    Mary Roe-105 is a Wisconsin resident and is a medical technologist for Group Health Plan, Inc.  She requested a religious exemption which has been neither granted nor denied at this time.  She has tested negative for Covid-19.

142.    Mary Roe-106 is a Wisconsin resident and is a medical technologist for Group Health Plan, Inc.  She requested a religious exemption which has been neither granted nor denied.  She has tested negative for Covid-19.

143.    Mary Roe-107 is a Wisconsin resident is a nurse for Group Health Plan, Inc.  She has requested a religious exemption which has neither been granted nor denied at this time.

144.    Mary Roe-108 is a Wisconsin resident that works as a Staff person for Group Health Plan, Inc.  She has requested a religious exemption which has neither been granted or denied.  She has tested negative for Covid-19.

145.    Mary Roe-109 is a Minnesota resident and works as a staff employee for Fairview.  She requested a religious exemption which has been neither granted nor denied.  She tested positive for Covid-19.

146.    John Doe-18 is a Minnesota resident who works as a staff employee for Fairview.  He requested a religious exemption which has been neither granted nor denied.  He tested negative for Covid-19.

147.    John Doe-19 is a Minnesota resident who works as a doctor for Fairview.  He has requested a religious exemption which has been neither granted nor denied.  He tested negative for Covid-19.

148.    John Doe-20 is a Minnesota resident and works as a physician for M Health Fairview—IC.  He has tested negative for Covid-19.

149.    John Doe-21 is a Minnesota resident and is a nurse for M Health Fairview. He requested a religious exemption which has neither been granted nor denied.  He has tested negative for Covid-19.

150.    Mary Roe-110 is a Minnesota resident and is a nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

151.    Mary Roe-111 is a cardiac sonographer for M Health Fairview.  He requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

152.    Mary Roe-112 works as a staff employee for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

153.    Mary Roe-113 is a Minnesota resident who works as a nurse liaison for M Health Partners.  She has requested a religious exemption which has been neither granted nor denied.  She has tested positive for Covid-19.

154.    Mary Roe-114 is a Minnesota resident and works as a CRNA for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

155.    Mary Roe-115 is a Minnesota resident and works as a sonographer for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.

156.    Mary Roe-116 is a Minnesota resident and works as staff for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

157.    Mary Roe-117 is a Minnesota resident and a physical therapist for M Health Fairview.  She has requested a religious exemption which has been granted.  She has tested negative for Covid-19.

158.     Mary Roe-118 is a Minnesota resident who works as a Nurse for M Health Fairview.  She has requested a religious exemption which has neither been granted or denied.  She has tested negative for Covid-19.

159.    Mary Roe-119 is a Minnesota resident and works as a Nurse for M Health Fairview.  She has tested negative for Covid-19.

160.    Mary Roe-120 is a Minnesota resident and works as a Nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested positive for Covid-19.

161.    Mary Roe-121 is a Minnesota resident and works as a Nurse for M Health Fairview.  She has requested a religious exemption which has neither been granted or denied.  She has tested negative for Covid-19.

162.    Mary Roe-122 is a Minnesota resident and works as a Nurse for M Health Fairview.  She has requested a religious exemption which has neither been granted or denied.  She has tested negative for Covid-19.

163.    Mary Roe-123 is a Minnesota resident and works as a Nurse for M Health Fairview.  She has requested a religious exemption which has neither been granted or denied.  She has tested negative for Covid-19.

164.    Mary Roe-124 is a Minnesota resident and works as a Technical employee for M Health Fairview.  She has tested negative for Covid-19.

165.    John Doe-22 is a Minnesota resident and works as PACS Administrator. He requested a religious exemption which has neither been granted nor denied.  He has tested positive for Covid-19.

166.    John Doe-23 is a Minnesota resident and works as a Nurse for M Health Fairview.  He has requested a religious exemption which has neither been granted or denied.  He has tested negative for Covid-19.

167.    Mary Roe-125 is a Minnesota resident and works as a Staff employee for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

168.    John Doe-24 is a Minnesota resident who works as a Staff employee for M Health Fairview.  He has applied for a religious exemption which has been granted.  He has tested negative for Covid-19.

169.    Mary Roe-126 is a Minnesota resident and works as a Technical employee for M Health Fairview.  She has tested negative for Covid-19.

170.    Mary Roe-127 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

171.    Mary Roe-128 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

172.    Mary Roe-129 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

173.    Mary Roe-130 is a Wisconsin resident and works as a technician for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

174.    Mary Roe-131 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested positive for Covid-19.

175.    John Doe-25 is a Minnesota resident and works as a nurse for M Health Fairview.  He has filed for a religious exemption and it has been granted.  He has tested negative for Covid-19.

176.    John Doe-26 is a Minnesota resident and works as an independent physician at M Health Fairview.  He requested a religious exemption which has neither been granted nor denied.  He has tested negative for Covid-19.

177.    Mary Roe-132 is a Minnesota resident and works as a Nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

178.    Mary Roe-133 is a Minnesota resident and works as a nurse for M Health Fairview.  She has filed a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

179.    Mary Roe-134 is a Minnesota resident and works as nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested positive for Covid-19.

180.    Mary Roe-135 is a Minnesota resident and works as a Nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

181.    Mary Roe-136 is a Minnesota resident and works as a surgical technologist. She requested a religious exemption which has been granted.  She has tested negative for Covid-19.

182.    Mary Roe-137 is a Minnesota resident and works as a nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

183.    Mary Roe-138 is a Minnesota resident and works as a doctor for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

184.    Mary Roe-139 is a Minnesota resident and works as a Nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

185.    Mary Roe-140 is a Minnesota resident and works as a nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

186.    Mary Roe-141 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

187.    Mary Roe-142 is a Minnesota resident and works as a nurse for M Health Fairview.  She requested a religious exemption which has neither been granted nor denied.  She has tested negative for Covid-19.

188.    John Doe-27 is a Minnesota resident and works as a nurse for M Health Fairview. He requested a religious exemption which has neither been granted nor denied. He has tested negative for Covid-19.

189.    Mary Roe-143 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

190.    Mary Roe-144 is a Minnesota resident who works as a CAN for M Health Fairview.  She has tested negative for Covid-19.

191.    Mary Roe-145 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

192.    Mary Roe-146 is a Minnesota resident and works as a nurse for M Health Fairview. She has tested negative for Covid-19.

193.    Mary Roe-147 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

194.    Mary Roe-148 is a Minnesota resident who works as a Nurse for M Health Fairview.  She has filed a request for religious exemption which has neither been granted nor denied.  She has tested positive for Covid-19.

195.    Mary Roe-149 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

196.    Mary Roe-150 is a Minnesota resident and works as a Technician for M Health Fairview. She requested a religious exemption which has neither been granted nor denied.   She has tested negative for Covid-19.

197.    Mary Roe-151 is a Minnesota resident and works as a nurse for M Health Fairview. She requested a religious exemption which has neither been granted nor denied. She has tested negative for Covid-19.

198.    Mary Roe-152 is a Minnesota resident and works as a Staff employee for M Health Fairview. She requested a religious exemption which has neither been granted nor denied.   She has tested negative for Covid-19.

199.    Mary Roe-153 is a Minnesota resident who works as a Nurse for M Health Fairview.  She requested a religious exemption which has been granted.   She has tested negative for Covid-19.

200.    Mary Roe-154 is a Minnesota resident who works as a Nurse for M Health Fairview. She requested a religious exemption which has been granted.   She has tested negative for Covid-19.

201.    John Doe-28 is a Minnesota resident employed as staff by Mayo Clinic. He requested a religious exemption from Mayo Clinic which has neither been granted nor denied. He tested negative for Covid-19.

202.    John Doe 29 is a Minnesota resident employed as staff by Mayo Clinic. He requested a religious exemption from Mayo Clinic which has neither been granted nor denied. He tested negative for Covid-19.

203.    Mary Roe-155 is a Minnesota resident employed as a technologist by Minnesota Radiation Oncology, P.A.. She requested a religious exemption from her employer but was denied. She tested negative for Covid-19.

204.    Mary Roe-156 is a Minnesota resident employed as a staff employee by North Memorial Health. She requested a religious exemption from North Memorial Health which has neither been granted nor denied. She tested negative for Covid-19.

205.   Mary Roe-157 is a Minnesota resident employed as a Nurse by Nothfield Hospital & Clinics. She requested a religious exemption from Northfield Hospital & Clinics which has neither been granted nor denied. She tested negative for Covid-19.

206.   Mary Roe-158 is a Minnesota resident employed as a Nurse by St. Luke's Hospital System. She requested a religious exemption from St. Luke's Hospital which has neither been granted nor denied. She tested negative for Covid-19.

207.   John Doe-30 is a Minnesota resident employed as Staff by St. Luke's Hospital System. He requested a religious exemption from Mayo Clinic which has neither been granted nor denied. He tested negative for Covid-19.

208.   Defendant the United States Department of Health and Human Services ("HHS") is an agency of the United States and is responsible for the administration and enforcement of the CDC Measure Specification.

209.   Defendant Xavier Becerra is the United States Secretary of Health and Human Services. As Secretary, he is responsible for the operation and management of the HHS. Defendant Becerra is sued in his official capacity only.

210.   Defendant the Center for Disease Control and Prevention is an agency of the United States government and is responsible for public health, disease control and prevention.

211.   Defendant Rochelle P. Walensky, MD, MPH, is the Director of CDC. Defendant Walensky is sued in her official capacity only.

212.   The Health Care Defendants all admit patients covered under the federal government's "Medicare" insurance system for seniors.  The Health Care Defendants

36

received payment for the medical care they provided from the federal government's Centers for Medicare & Medicaid Services.

213.    Defendant Centers for Medicare & Medicaid Services ("CMS"), is a federal agency within the United States Department of Health and Human Services ("HHS"). Among other things, CMS administers the Medicare program and works in partnership with state governments to administer Medicaid, the Children's Health Insurance Program (CHIP), and health insurance portability standards. In addition to these programs, CMS has other responsibilities, including the administrative simplification standards from the Health Insurance Portability and Accountability Act of 1996 (HIPAA), quality standards in long-term care facilities (more commonly referred to as nursing homes) through its survey and certification process, clinical laboratory quality standards under the Clinical Laboratory Improvement Amendments, and oversight of HealthCare.gov.

214.    Defendant Allina Health System is a Minnesota non-profit corporation, with registered office address at 2925 Chicago Ave Mail Route 10905, Minneapolis, MN 55407–1321.  Defendant Allina Health System owns the assumed names of Abbott Northwestern, Cambridge Medical Center, Mercy Hospital, Phillips Eye Institute, and United Hospital.

215.    Defendant Affiliated Community Medical Centers, Ltd. is a Minnesota business corporation, with registered office address at 101 Willmar Ave., Willmar, MN 56201.  Defendant Affiliated Community Medical Centers, Ltd. owns the assumed name of Carris Health.

216.    Defendant Carris Health - Redwood, LLC is a Minnesota limited liability company with registered office address at 100 Fallwood Road, Redwood Falls, MN 56283.

217.    Defendant CentraCare Health System is a Minnesota non-profit corporation, with registered office address at 1406 N 6th Ave, St Cloud, MN 56303.

218.    Defendant Group Health Plan, Inc. is a Minnesota non-profit corporation, with registered office address at 8170 33rd Avenue South, Bloomington, MN 55425. Group Health Plan, Inc. owns the assumed names Group Health Plan, Inc., and Group Health Plan, Inc. Clinic.

219.    Defendant Regions Hospital is a Minnesota non-profit corporation with registered office address of 640 Jackson Street, St Paul, MN 55101.

220.    Defendant Children's Health Care is a Minnesota non-profit corporation with registered office address at 1010 Dale St N, St Paul, MN 55117–5603. Children's Health Care owns the assumed name of Children's Hospital of Minnesota.

221.    Defendant Essentia Health is a Minnesota non-profit corporation with registered office address at 502 E 2nd Street, Duluth, MN 55805.

222.    Defendant SMDC Medical Center is a Minnesota non-profit corporation with registered office address of 502 E 2nd Street, Duluth, MN 55805. SMDC Medical Center owns the assumed name of Essentia Health Duluth Clinic.

223.    Defendant St. Marys Duluth Clinic Health System is a Minnesota non-profit corporation with registered address at 400 E 3rd Street, Duluth, MN 55805. St. Marys Duluth Clinic Health System owns the assumed name of Essentia Health East.

224.    Defendant Fairview Health Services is a Minnesota non-profit corporation with registered office address at 1010 Dale Street North, St. Paul, MN 55117. Fairview Health Services owns the assumed names of Fairview Southdale Hospital, and Fairview Ridges Hospital.

225.    Defendant Fairview Physician Associates Network is a Minnesota non-profit corporation with registered office address at 2450 Riverside Ave, Minneapolis, MN 55454.

226.    Defendant University of Minnesota Physicians is a Minnesota non-profit corporation with registered office address at 720 Washington Ave SE #200, Minneapolis, MN 55414.  University of Minnesota Physicians owns the assumed name M Health.

227.    Defendant Gillette Children's Specialty Healthcare is a Minnesota non-profit corporation with registered office address at 200 E University Ave., St Paul, MN 55101.

228.    Defendant Mayo Clinic is a Minnesota non-profit corporation with registered office address of 200 1st Street SW, Rochester, MN 55905.

229.    Defendant North Memorial Health Care is a Minnesota non-profit corporation with registered office address at 3300 N Oakdale Ave., Robbinsdale, MN 55422.

230.    Defendant Park Nicollet Methodist Hospital is a Minnesota non-profit corporation with registered office address at 6500 Excelsior Blvd, St Louis Park, MN 55426.

231.    Defendant St. Luke's Hospital of Duluth is a Minnesota non-profit corporation with registered office address at 915 East First Street, Duluth, MN 55805.

232.    Defendant Minneapolis Radiation Oncology, P.A. is a Minnesota business corporation with registered office address at 7401 Metro Blvd #210, Edina, MN 55439–3086.

## JURISDICTION AND VENUE

233.   This Court has jurisdiction over all claims pursuant to 28 U.S.C. §§1331, 1343(a)(3)-(4), 1361, and 42 U.S.C. §§1983 and 1988, as well as under non-statutory equitable jurisdiction.  The Plaintiff employees' claims arise under the Constitution and Statutes of the United States and because Plaintiffs seek prospective redress against state actors in their official capacity to end the deprivation, under state law, of their rights, privileges, and immunities secured by federal law.

234.   This Court also has jurisdiction pursuant to the Declaratory Judgment Act as codified at 28 U.S.C. §§2201 and 2202, 42 U.S.C. §2000bb-1, and 5 U.S.C. §702. This Court also has jurisdiction to award reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. §2412, and 42 U.S.C. §1988.

235.   Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendants reside in this District and because a substantial part of the events giving rise to the claim occurred in this District.

236.   Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendants reside in this District and because a substantial part of the events giving rise to the claim occurred in this District.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

"No one should be forced to be vaccinated against their will both because of the constitutional right to refuse treatment, and pragmatically because forced vaccination will deter at least some people from seeking medical help when they need it."

"Following this flawed logic, several state-based proposals have sought to address any 'public health emergency,' … [by] resort[ing] to punitive, police-state tactics, such as forced examinations, vaccination and treatment, and criminal sanctions for those individuals who did not follow the rules."

-The American Civil Liberties Union in 2008.

237.    Medical workers were hailed as heroes throughout this pandemic, and in fact the Plaintiff employee medical workers have worked with patients for 18 months without vaccinations.  Now, however, they are required to be vaccinated or lose their jobs.  Instead of being hailed as heroes now, they are chastised and ridiculed as "anti-vaxxers" or worse.

238.    The HHS and the Health Care Defendants act as if the emergency powers had not ended, and may never end.  Not satisfied with just mandating the vaccine, the Defendants are talking about boosters, and "six months" as the limited expectation of the vaccine's effectiveness, third shots, and even fourth shots.  President Biden has strongly suggested that boosters will be mandated soon.  Plaintiffs seek the protection of this Court and the affirmative relief identified hereunder.

### A. Background Pertaining to The Coronavirus Pandemic and COVID-19 Vaccines.

239.    The novel coronavirus SARS-CoV-2, which can cause the disease COVID-

19, is a contagious virus spread mainly through person-to-person contact, including
through the air.

240.    It is well-settled that the coronavirus presents a significant risk primarily to
individuals aged 70 or older and those with comorbidities such as obesity and diabetes.
Exhibit C, Bhattacharya and Kulldorff Joint Decl. ¶¶ 10-14 ("Joint Declaration") [1] *See*
Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,*
NATURE (Aug. 28, 2020).

241.    In fact, a meta-analysis published by the World Health Organization
("WHO") concluded that the survival rate for COVID-19 patients under 70 years of age
was 99.95%. *Joint Decl. ¶ 10.*

242.    The CDC estimates that the survival rate for young adults between 20 and
49 is 99.95% and for people aged 50-64 is 99.4%.  *Joint Decl. ¶ 12.*

243.    A seroprevalence study of COVID-19 in Geneva, Switzerland, reached a
similar conclusion, estimating a survival rate of approximately 99.4% for patients between
50 and 64 years old, and 99.95% for patients between 20 and 49. *Joint Decl. ¶ 13.*

244.    Most of the Plaintiff employees are in the 20-64 range and therefore have a
survival rate of 99.4% and up to 99.95%.

245.    Since some Plaintiff employees have had COVID and recovered, they have
developed natural immunity, which means that their survival rates against future Covid-19

---

[1] The Bhattacharya and Kulldorff Joint Declaration is part of the record in *Norris v.
Stanley*, Court File No. 1:21-cv-00756, W.D. Michigan 2021.  It is referred to hereafter at
the "Joint Declaration."

is more than the 99.95% and 99.4% rates.

246.    There have only been less than 10 deaths per day in Minnesota on average

the last week, compared to around 70 per day in December 2020.  As already set forth,

Governor Walz ended the statewide peacetime emergency on June 30, 2021.

## B.  The Plaintiff Employees Require the Use of Pseudonyms Because of Pressure on Getting Vaccinated.

247.   The same "front line" health care workers hailed as heroes by the media for

treating Covid patients before vaccines were available, and even for months after the

vaccines became available, including the Plaintiff employees herein, are now vilified by

the same media as pariahs who must be set apart from society until they are shamed,

threatened, or now mandated into vaccinating.

248.   The Health Care Defendants' Vaccine Mandate Policies are caused by the

CDC Measure Specification.  The CDC Measure Specification and Health Care

Defendants' Vaccine Mandates have created an atmosphere of fear and irrationality in

which the unvaccinated are threatened with being reduced to a caste of untouchables if

they will not consent to being injected with vaccines that violate their religious beliefs.

The vaccines are not as effective as promised. The vaccines have caused severe and even

life-threatening side effects, including blood clots, [2] anaphylaxis, disabling injuries and

what the CDC admits is "'likely association' between a rare heart inflammatory

---

[2] Study in the journal Nature: "Antibody epitopes in vaccine-induced immune thrombotic thrombocytopaenia," July 7, 2021; available at https://www.nature.com/articles/s41586-021-03744-4.

43

condition in adolescents and young adults [under age 30] mostly after they've received their second COVID-19 vaccine shot …"[3]

249.   The vaccines are being mandated or strongly recommended to nearly everyone—the young, the old, the healthy, the previously recovered and naturally immune—with little assessment of the risks or benefits for each individual, regardless of medical necessity or contraindications in each particular case.  College admissions are being revoked, career paths blocked, employment terminated, and lives ruined on a vast scale.  Nothing like this has ever been seen in our nation.

250.   However, the CDC now admits that the Covid-19 vaccines do not prevent viral transmission or infection, especially by the "Delta variant."[4]

251.   According to "public health authorities," those vaccinated with the Covid-19 vaccines can still infect the unvaccinated, the unvaccinated can infect the vaccinated, both the vaccinated and the unvaccinated can infect each other, and everyone must wear masks indoors in "high transmission" areas—which means virtually the entire country[5]—as if no one at all had been vaccinated.[6]  And, with both the "fully

---

[3] *See* Berkeley Lovelace, Jr. "CDC safety group says there's a likely link between rare heart inflammation in young people after Covid shot," CNBC, June 23, 2021 at https://tinyurl.com/sse5zsr9.

[4] Frank Diamond, *Infection Control Today*, "Vaccines Not as Effective against the Delta Variant, say CDC Data," August 25, 2021 at https://www.infectioncontroltoday.com/view/vaccines-not-as-effective-against-delta-variant-says-cdc-data.

[5] *See*, CDC Map at https://www.usatoday.com/in-depth/graphics/2021/07/29/cdc-mask-guidelines-map-high-covid-transmission-county/5400268001/.

[6] *See,* "When You've Been Fully Vaccinated," https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html.

vaccinated" and the unvaccinated still contracting Covid, "booster shots" of the same vaccines, to which Plaintiff employees have the same objections, are on the way as promised by President Biden, accompanied by further government mandates.[7]

252.   The Plaintiff employees seek leave of court to proceed anonymously because they risk being ostracized, being fired  and other retaliatory consequences if their names become known, and even public hate, as is shown by the following examples of a pervasive climate of fear and loathing of the unvaccinated:

    a.   MSNBC guest Frank Schaeffer stating that those who are "anti-vaccine" are "bio terrorists" who should be the target of "drone strikes."[8]

    b.   New York City Mayor de Blasio, announcing his "vaccine passport for New York City declared that "If you want to participate in our society fully, you've got to get vaccinated."[9]

    c.   On ABC News, commentator Margaret Hoover declared that government, by withholding all benefits from the unvaccinated, should "just make it almost impossible for people to—to live their lives without being protected and protecting the rest of us."[10]

---

[7] "**That's where boosters come in** — the shots that give you even more protection than after your second shot. …Last month, our top government doctors announced **an initial plan for booster shots for vaccinated Americans.**  They believe that a booster is likely to provide the highest level of protection yet.  Of course, the decision of which booster shots to give, when to start them, and who will give them, will be left completely to the scientists at the FDA and the Centers for Disease Control.  …  We've bought enough boosters — enough booster shots — and the distribution system is ready to administer them. "  Fahnlander Decl., Ex. G, President Biden on September 9, 2021, comments accompanying his Executive Order No. 14043 mandating vaccines for government workers and private employers with more than 100 employees. (emphasis added)
[8] https://www.breitbart.com/politics/2021/09/10/msnbc-guest-calls-drone-strikes-americans-opposed-vaccine-mandates/.
[9] See video @https://tinyrul.com/j4npw5c h
[10] This Week, July 25, 2021, https://abcnews.go.com/Politics/week-transcript-25-21-speaker-nancy-pelosi-sen/story?id=79045738.

d. On CNN, commentator Don Lemon stated to Chris Cuomo that "[If you] don't get the vaccine, you can't go to the supermarket. Don't have the vaccine, can't go to the ball game. Don't have a vaccine, can't go to work. You don't have a vaccine, can't come here. No shirt, no shoes, no service."[11]

e. On his late night "comedy" show Jimmy Kimmel stated that the unvaccinated who contract COVID should be allowed to die rather than being admitted to the hospital: "Rest in peace, wheezy."[12] The audience roared its approval.

f. In The Week, Ryan Cooper declared that "Anti-vaxxers" (i.e. people who decline the COVID vaccines) "should be exiled from society until they get their shots, and their efforts to intimidate people against controlling the pandemic should be met with massive resistance."[13]

g. President Biden, in his remarks accompanying his Executive Order stated: "This is a pandemic of the unvaccinated. …   Instead of encouraging people to get vaccinated and mask up, they're [other elected officials] ordering mobile morgues for the unvaccinated dying from COVID in their communities. This is totally unacceptable. … That 25 percent [unvaccinated] can cause a lot of damage — and they are. … The unvaccinated overcrowd our hospitals, are overrunning the emergency rooms and intensive care units, leaving no room … [the unvaccinated] are keeping us from turning the corner. These pandemic politics, as I refer to, are making people sick, causing unvaccinated people to die. We cannot allow these actions to stand in the way of protecting the large majority of Americans…We've been patient, but our patience is wearing thin. And your refusal has cost all of us. … For the vast majority of you who have gotten vaccinated, I understand your anger at those who haven't gotten vaccinated. … "  President Biden address, September 9, 2021.

253.    Influential Americans, including the President himself, are stirring up "anger," blame, and hostility against the unvaccinated, necessitating anonymity in this lawsuit.

---

[11] https://www.realclearpolitics.com/video/2021/08/01/don_lemon_no_shirt_no_shoes_no_vaccine_no_service.html.

[12] https://www.westernjournal.com/late-night-host-ghoulishly-mocks-sick-unvaccinated-rest-peace-wheezy/.

[13] https://theweek.com/coronavirus/1002909/theres-1-obvious-solution-to-the-delta-variant-mandatory-vaccination.

**C. Defendant CMS Requires Healthcare Providers to Calculate the Percentage of Employees Vaccinated in Order to Maintain Federal Subsidies Under Medicare and Medicaid Without Excluding Employees Who Refuse to Receive a Covid-19 Vaccine Injection Due to Religious Objections.**

254.    Prior to 1983, CMS reimbursed hospitals for the services they provided Medicare patients on a cost basis. However, in 1983, Congress determined that the cost basis payment system was too expensive and too inefficient. In response, in 1983 Congress instituted a "major change to the method of payment under Medicare for inpatient hospital services." It enacted legislation to pay most hospitals for most costs under an inpatient prospective payment system ("IPPS").  IPPS applies only to inpatient operating costs. Separate prospective payment systems have been developed for inpatient rehabilitation facilities, long-term care hospitals, and inpatient psychiatric facilities.

255.    Under the IPPS, the hospital is reimbursed by CMS based on the procedures provided to the patient at rates set annually by CMS as adjusted for the wage index for the area the hospital was located in and weighting adjustment factor set by CMS.

256.    In 2005, Congress created a "value based purchasing" program ("VBP") further changing the reimbursement payments to hospitals.  The Hospital VBP Program rewards acute care hospitals with incentive payments for the quality of care provided in the inpatient hospital setting. This program adjusts payments to hospitals under the IPPS based on the quality of care they deliver.

257.   Under the VBP program, hospitals must report to CMS certain metrics regarding the hospital's care provided to patients as well as other factors.  Based on these metrics, CMS adjusts the amount of the reimbursement paid to the hospital.

258.   The Vaccine Mandate Policies are the result of HHS incorporating the CDC's Measure Specification.  Fed. Reg. 2021/05/10/2021-08888 and CDC Measure Specification: NHSN Covid-19 Vaccination Coverage Updated August 21 2021.  Final Rule on Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System, 86 Fed. Reg. 44774 (rule issued August 2, 2021, published in the Federal Register August 13, 2021).

259.   The CDC's Measure Specification, in this case, requires that certain health care employers, including the Healthcare Defendants report to HHS on the "the percentage of healthcare personnel (HCP) who receive a complete COVID-19 vaccination course" to successfully participate in federal subsidies. *Id*. at 45376.

260.   The CDC's Measure Specification involves specific details for calculating "the percentage of healthcare personnel (HCP) who receive a complete COVID-19 vaccination course"—including instructions on calculating the numerator and denominator. *Id*.

261.   The CDC's Measure Specification's numerator statement is "[c]umulative number of HCP eligible to work in the hospital or facility for at least one day during the reporting period and who received a completed vaccination course against SARS-CoV-2."

48

262.    The CDC's Measure Specification's denominator statement is "Number of HCP eligible to work in the health care facility for at least one day during the reporting period, excluding persons with contradictions to SARS-CoV-2 vaccination." *Id.*

263.    The CDC's Measure Specification has denominator exclusions as follows:

Denominator Exclusions HCP in the denominator who were determined to have a medical contraindication or condition specified by Food and Drug Administration (FDA) labeling or authorization, CDC or Advisory Committee on Immunization Practices (ACIP) recommendations. HCP can provide verbal statements for medical contraindications to (and declination of) the vaccine. Denominator Exclusion Details The denominator for this measure excludes HCP with documented contraindications to COVID19 vaccine. As of March 2021, CDC considers contraindications to vaccination with COVID-19 vaccines to be:

• Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine.

• Immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the vaccine.  *Id.*

264.    The CDC's Measure Specification's denominator exclusions provision does not exclude health care persons who have religious objections to the COVID-19 vaccine. *Id.*

265.    Consequently, the religious objector's employer needs to include the religious objector as well as those who have recovered from Covid-19 in the denominator under the CDC's Measure Specification.

266.    The CDC's Measure Specification's reporting requirement places a substantial burden on the religious objectors or those who have recovered from Covid-19, such as the Plaintiff employees, since their employers will have to report them as part of the denominator under the CDC's Measure Specification, despite their religious objection

or the fact that they have fully recovered from Covid-19 and therefore have natural immunity to Covid-19.

267.    As a result of including religious objectors and those who have recovered from Covid-19 in the denominator, the Plaintiffs' employers will be required to report a lower percentage of employees vaccinated to the CMS.  This lower percentage will further reduce the employer's VBP score and thereby reduce the amount of payments CMS or HHS makes to those employers under Medicare and Medicaid.

268.    In the comments and responses to the final rule, the HHS admitted that religious objectors would not be excluded from the denominator:

> *Response:* We agree with the commenters who note that [Healthcare Personnel (hereinafter ("HCP")] may have legitimate reasons to decline vaccination, including a contraindication, and this measure does not require HCP to receive the vaccine. The intent of adopting the COVID-19 Vaccination Coverage Among HCP measure is to collect and report data that will support public health tracking and provide patients, beneficiaries, and their caregivers important information to support informed decision making. For these reasons, we believe that it is appropriate to collect and report these data as soon as possible.
> As noted in the measure specifications, HCP who are determined to have a medical contraindication specified by FDA labeling or authorization, CDC, or ACIP recommendations are excluded from the denominator of this measure. The CDC and FDA consider contraindications to vaccination with COVID-19 vaccines to be: (1) Severe allergic reaction (for example, anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine; or (2) immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the vaccine.  For example, as stated in the FDA-authorized Fact Sheets for two COVID-19 vaccines, "the decision to administer the [Pfizer/Moderna] COVID-19 Vaccine to an individual with a history of myocarditis or pericarditis should take into account the individual's clinical circumstances." We also recognize that there are reasons, including religious objections or concerns regarding an individual provider's specific health status, that may lead individual HCP to decline vaccination. We emphasize that this measure does not mandate vaccines, it only requires reporting of vaccination rates for successful program participation. We do not expect 100 percent vaccination coverage among HCP. However, we do believe that coverage rates are meaningful data for patients and beneficiaries to use in

choosing a hospital, and can also be used for public health tracking.  *See id*. at 45379.

269.    In this response to the comment, HHS admits it knew that the denominator would include religious objectors, but failed to consider the substantial burden this would put on religious objectors' exercise of their religious faith personally and in their place of employment.

270.    Additionally, the Plaintiff employees and other health care workers, who already have immunity because they have fully recovered from Covid-19, are under threat of loss of employment, despite the fact that their natural immunity is superior to the vaccinated.

271.    For those who have recovered from Covid-19 and therefore immune, the vaccine risk, no matter how small, outweighs the benefit of Covid-19 vaccination which is zero.

**D. The Defendant Employer Vaccine Mandate Policies.**

272.    The Vaccine Mandate Policies require the Plaintiff employees to be vaccinated or face termination or differential treatment.

273.    The differential treatment to the Plaintiff employees includes:

- Frequent Covid-19 testing despite the fact that the vaccinated are contracting and transmitting delta at a high rate;

- Requirements of face masking;

- Requirements of social distancing; and,

- Assignment of different job responsibilities, including more

51

limited contact with patients or co-workers.

274.    For example, in July 2021, Defendant Fairview announced a COVID Mandate/policy that "Covid-19 vaccines" are a "work requirement this year." The Policy requires Fairview employees to "receive a vaccine or accommodation" by October 31, 2021.   This is referred to as a "deadline" and "a condition of continued employment." See, Fahnlander Decl., Ex. I Fairview "Vaccine Frequently Asked Questions," found at https://mnfhs.sharepoint.com/sites/2019NovelCoronavirus/SitePages/COVID-19-Vaccine-Frequently-Asked-Questions.aspx#flu-vaccine-faqs%E2%8.

275.    Absent from the Vaccine Mandate Policies, or the FAQs, talking points or institutional literature of the Defendants, is recognition of natural immunity, the role it plays, its effectiveness in protecting the employees and those the employees come into contact with, and how it lessens the very risks the vaccines are intended to guard against.

276.    Despite the fact that the Defendant Healthcare employers are ordering the Plaintiff employees to take the vaccines or suffer termination, the Vaccine Mandate Policies do not allow any exceptions to those who have natural immunity and has no provision for testing for antibodies which would prove that a person is immune from Covid-19.

277.    The only alternative the Defendant Healthcare employers offer the Plaintiff employees to obtaining the Vaccine is termination of employment. This threat has been conveyed to the Plaintiff employees via policy statements, FAQs, talking points, and emails.

278.    The Vaccine Mandate Policies are coercing the Plaintiff employees to violate their religious beliefs. The Plaintiff employees will continue to be harmed unless this Court provides them relief from the Defendants' illegal and unconstitutional actions.

279.    The Plaintiffs have no adequate remedy at law.

**E. Known Risks and Side Effects of the Vaccines That Plaintiffs Are Being Compelled To Take.**

280.    The FAQ's the Defendant Healthcare employers issued in conjunction with the issuance of the Vaccine Mandate Policies contain these disclaimers of the dangers of receiving one of the Covid-19 vaccines.

    a.  **Pfizer**: severe allergic reaction; rash, itching, hives, or swelling of the face; myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of the lining outside the heart); injection site pain, tiredness, headache, muscle pain, chills, joint pain, fever, injection site swelling, injection site redness, nausea, feeling unwell, swollen lymph nodes, diarrhea, vomiting, and arm pain have occurred according to Pfizer's Fact Sheet.

    b.  **Moderna:** severe allergic reactions, including anaphylaxis, myocarditis and pericarditis, pain at the injection site, fatigue, headache, myalgia, arthralgia, chills, nausea/vomiting, axillary swelling/tenderness, fever, swelling at the injection site, and erythema at the injection site according to the Moderna Fact Sheet,

    c.  **Johnson & Johnson**: severe allegic reaction, thrombosis with thrombocytopenia, Guillain-Barre syndrome, and capillary leak syndrome, injection site pain, headache, fatigue, myalgia, nausea, fever, injection site erythema and injection site swelling, according to Johnson & Johnson Fact Sheet.

281.    The Vaccine Adverse Event Reporting System ("VAERS") is a national intra healthcare reporting system for adverse reactions to a vaccine injection.  The

53

following is a recent tabulation on VAERS data on adverse events following

vaccinations:

BROKEN DOWN BY AGE
--------------------------------
0 - 17 YEARS OLD:
▪23 Deaths
▪235 Life Threating
▪99 Permanently Disabled

18 - 29 YEARS OLD:
▪100 Deaths
▪643 Life Threating
▪560 Permanently Disabled

30 - 49 YEARS OLD
▪162 Deaths
▪976 Life Threating
▪1,034 Permanently Disabled

50 - 64 YEARS OLD
▪1,134 Deaths
▪3,326 Life Threating
▪2,961 Permanently Disabled

65 + YEARS OLD
▪5,305 Deaths
▪3,149 Life Threating
▪2,699 Permanently Disabled

UNKNOWN AGE
▪104 Deaths
▪135 Life Threating
▪100 Permanently Disabled
--------------------------------
TOTAL EVENTS:
▪DEATHS: 6,828
▪LIFE THREATENING: 8,464
▪PERMANENTLY DISABLED: 7,453
▪HOSPITALIZATIONS: 30,357

282.    Recent research states that vaccination presents a heightened risk of adverse side effects-including serious ones-to those who have previously contracted and recovered from COVID-19.  Ex. D, *Noorchashm Decl. ¶¶ 22-26[14]; Ex. C, Joint Decl. ¶ 27.*

283.    The heightened risk of adverse effects results from "preexisting immunity to SARS- Cov-2 [that] may trigger unexpectedly intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals." Angeli et al., *SARS-Co V-2 Vaccines: Lights and Shadows,* 88 EUR. J. INTERNAL MED. 1, 8 (2021); pubmed.ncbi.hlm.nih.gov/339669301, last viewed Sept. 23, 2021.

284.    Thus, the adverse effects to the Plaintiff employees from being coerced to receive the vaccine pursuant to the Vaccine Mandate Policies are not theoretical, hypothetical or academic—they are very real and have real victims, some of which a number of the Plaintiff employees have experienced firsthand.

285.    In addition, the sheer number of the VAERS reports of adverse effects to those receiving the Covid-19 vaccine are very concerning to the Plaintiff employees in this case.

286.    The Moderna and Pfizer Vaccines are also made with polyethyline glycol ("PEG").  PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells which keeps the MRNA from dispersing and

---

[14] The Declaration of Hooman Noorchashm has also been introduced in other litigation, see *Norris v. Stanley*, Court File No. 1:21-cv-00756, W.D. Michigan 2021.

not reaching its intended target.  PEG performs its intended use.  Unfortunately, about 70% of the U.S.  Population is slightly to somewhat allergic to PEG.  Despite that most of the United States is only mildly allergic to PEG, approximately 7% of the U.S.  Population is highly allergic to PEG.  Despite this very well-known fact, none of the Health Care Defendants are offering PEG allergy testing as part of their Vaccine Mandate Policies.  Nor are the Defendant employers offering any indemnity or disability coverage from the known potential adverse effects of the Vaccines.

287.   The National Institute of Health ("NIH") began a clinical trial of "systemic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to recipients of those vaccines experiencing anaphylaxis."  https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.

288.   Reactions to some of Moderna's products were tied to the usage of PEG, as noted in Moderna's Form S-1 Registration Statement filed with the United States Securities and Exchange Commission.

289.   It was also noted that "The Pfizer/BioNTech COVID-19 vaccine can cause severe anaphylaxis" tied to the PEG used.  *See* https://onlinelibrary.wiley.com/doi/10.1111/cea.13874.

290.   On the first day the United Kingdom began its vaccination program, there were reports of 2 cases of anaphylaxis and a third case of an allergic reaction.  *Id.*  It was believed the cause was PEG used in the Pfizer vaccine.  *Id.*  These side effects cause

"throat constriction, cough and then loss of consciousness."  PEG used in the Pfizer

vaccine was later determined by a research letter to be the cause of anaphylaxis.

**F. Prior Infection Leads to Naturally-Acquired Immunity to Covid-19 at Least As Robust As Vaccine-Acquired Immunity.**

291.    Naturally acquired immunity refers to immunity obtained by having had a

virus, such as Covid-19.  After the infected person has been infected with the virus, the

infected person's immune system develops antibodies to combat the virus. After the

infected person recovers from the virus, the infected person's antibodies continue to

recognize the virus and, if the infected person later is exposed to the virus after recovery,

the infected person's immune system will prevent a new infection.

292.    Natural immunity developed after recovery from COVID-19 provides

broad protection against severe disease from subsequent SARS-CoV-2 infection. *Joint

Decl. ¶ 15*.

293.    Multiple extensive, peer-reviewed studies comparing naturally acquired and

vaccine acquired immunity have concluded overwhelmingly that the former provides

equivalent or greater protection against severe infection than immunity generated by

mRNA vaccines (Pfizer and Moderna).  *Joint Decl. ¶ 18*.

294.    These studies confirm the efficacy of natural immunity against reinfection

of Covid-19 and show that almost all re-infections are less severe than first-time

infections and almost never require hospitalization.  *Joint Decl. ¶ 19*.

295.    A CDC/IDSA clinician call on July 29, 2021, summarized the current state

of the knowledge regarding the comparative efficacy of natural and vaccine immunity.

The presentation reviewed three studies that directly compared the efficacy of prior infection versus mRNA vaccine treatment and concluded "the protective effect of prior infection was similar to 2 doses of a COVID-19 vaccine."

296.   Given that there is currently more data on the durability of natural immunity than there is for vaccine immunity, researchers rely on the expected durability of natural immunity to predict that of vaccine immunity. *Joint Decl. ¶ 22.*

297.   Indeed, natural and vaccine immunity utilize the same basic immunological mechanism- stimulating the immune system to generate an antibody response.  *Joint Decl. ¶ 16.*

298.   In fact, the level of antibodies in the blood of those who have natural immunity was initially the benchmark in clinical trials for determining the efficacy of vaccines.  *Joint Decl. ¶ 16.*

**G.  Natural Immunity is Long-Lasting.**

299.   Numerous studies have demonstrated prolonged immunity with respect to memory T- and B-cells, bone marrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B-cells following a Covid-19 infection. Joint Declaration. ¶ 17; Dr. Harvey Risch, Yale School of Medicine, interview ("Risch interview"), *Laura Ingraham Discusses How Medical Experts Are Increasing Vaccine Hesitancy* (July 26, 2021), *available at* https://bit.ly/3zOL6Sx (last visited Sept. 23, 2021).

300.   T-cells last "quite a while," however, B-cells migrate to the bone marrow and last even longer.  Risch Interview.  When people have had Covid and recovered they are presumed to have natural immunity. See also, Ex. D, Noorchashm Decl., Par. 16,

"experience with prior coronaviruses strongly indicates that T-cell immunity provided by natural immunity could last years or even decades."

301.   New variants of Covid-19 resulting from the Covid-19's virus's mutation do not escape the natural immunity developed by prior infection from the original strain of the virus.

302.   While the Defendant Employers' literature sometimes gives superficial recognition to natural immunity, it does not provide accurate recognition of the natural immunity protection it affords to employees, co-workers of unvaccinated but Covid-recovered employees, and customers or patients of the employees.

303.   Absent also from the Vaccine Mandate Policies is any discussion of whether the Vaccine is necessary for employees with natural immunity, or simply constitutes risk for them.

**H. The Immunity Levels of the Vaccines Vary, But Are Declining.**

304.   A number of studies and commentators suggest that the vaccines provide immunity for only 5-8 months.

305.   Most importantly, studies are showing that that even those who have been vaccinated are being infected and sickened a second time from Covid-19.  Such infections, known as "breakthrough infections" because the Covid-19 virus was able to "breakthrough" the vaccine which was supposed to prevent a second infection, account for up to 74% of new infections according to one study, and these are people who have been vaccinated. CDC Weekly/August 6, 2021, Catherine M Brown, DVM, et al. report.

306.    In the State of Israel, where vaccination levels have hit 80 % of the population and therefore accordingly have been thought to be the most effective, Covid-19 vaccines are failing massively to "contain the virus," and the national government is moving toward requiring the population to receive multiple additional "booster" vaccinations meaning the "vaccinated" must get multiple shots.[15][16] In the United States, the Biden administration is already promoting the "three shots = fully vaccinated" narrative: "It will make you safer, and for longer, and it will help us end the pandemic faster," said Biden in a speech on August 18, 2021, supporting a third shot (at least) "booster."[17]  *See also* Fahnlander Decl. Ex. G.

307.    In fact, vaccine immunity only targets the spike-protein of the original Wuhan Covid-19 variant, whereas natural immunity, with its full complement of SARS-CoV-2 proteins, provides protection against a greater array of variants.  *Noorchashm Decl. ¶ 17.*

---

[15] "Three doses not two: Israel sets new benchmark for full vaccination.  It is on India's horizon as well," The Times of India, September 1, 2021 @https://timesofindia.indiatimes.com/blogs/toi-editorials/three-doses-not-two-israel-sets-new-benchmark-for-full-vaccination-it-is-onindias-horizon-as-well/, last viewed Sept. 23, 2021.

[16] "New normal: Israel's health expert says fourth shot of Covid vaccine needed," September 5, 2021, Wio News, https://www.wionews.com/world/new-normal-israels-health-expert-says-fourth-shot-of-covid-vaccine-needed-410904, last viewed Sept. 23, 2021.

[17] https://www.politico.com/news/2021/08/18/biden-recommends-covid-booster-shots-505911. Last viewed Sept. 23, 2021.

308.    The Janssen Vaccine provides immunity protection of somewhere between 66% and 85%, far below that conferred by natural immunity.  *Joint Declaration. ¶¶ 16; Noorchashm Decl. ¶ 15.*

309.    The Moderna and Pfizer vaccines are also inferior to the protection of natural immunity.

310.    Defendant Fairview's FAQs admit that "a small percentage of people who are fully vaccinated will still get COVID-19 after they are vaccinated if they are exposed to the virus."  Fahnlander Decl., Ex. I, Fairview Sharepoint "Vaccine Frequently Asked Questions," p. 10.

**I.   Defendant Fairview, As Well As the Federal Government, Acknowledge Natural Immunity, But Plead Ignorance About its Effectiveness, and Nonetheless Mandate Vaccines Despite Their Ignorance of the Levels of Immunity.**

311.    In discussing natural immunity, one of the Healthcare Defendants recognizes that "We don't know how long protections last for those who get infected or those who are vaccinated."  Fahnlander Decl., Ex. I, Sharepoint "Vaccine Frequently Asked Questions," p. 11.

312.    Instead of keeping open the research to determine this relevant question as to how long natural immunity will last as opposed to vaccine immunity, Fairview instead mandates the vaccine "in the case that natural immunity from infection diminishes over time."  Fahnlander Decl., Ex. I, Sharepont "Vaccine Frequently Asked Questions,"  pp. 11-12.

313.    Fairview's Vaccine Mandate Policy does not give recognition to COVID-19 recovered persons as having natural immunity and therefore being entitled to an exemption from the Mandate.  Fairview further admits the reality of natural immunity, but then illogically ignores it and demands vaccination anyway, even though the vaccination is unnecessary and potentially damaging to its Plaintiff employees due to the side effects.

### J. Natural Immunity Is Superior for Protection Against Newer Variants, Including the Delta Variant.

314.    Research data states suggests that naturally acquired immunity may provide greater protection against both the Delta and Gamma variants than vaccine-induced immunity. A recent analysis of an outbreak among a small group of mine workers in French Guiana found that 60% of fully vaccinated miners suffered breakthrough infections compared to *zero* among those with natural immunity. Nicolas Vignier, et al., *Breakthrough Infections of SARS-Co V-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guiana, 2021,* 27(10) EMERG. INFECT. DIS. (Oct. 2021), *available at* bit.ly/2Vmjx43 (last visited Sept. 23, 2021).

315.    Very recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels. *See CDC reversal on indoor masking prompts experts to ask,* "*Where's the data?*", WASHINGTON POST (July 28, 2021), *available at* wapo.st/2THpmIQ  (last visited Sept. 23, 2021).

316.    Approximately three-quarters of cases in a recent outbreak in Massachusetts on Cape Cod occurred in vaccinated individuals, again demonstrating that the vaccines are inferior to natural immunity when it comes to preventing infection. *See* Molly Walker, *CDC Alarmed: 74% of Cases hit Cape Cod Cluster Were Among the Vaxxed,* MEDPAGE TODAY (July 30, 2021), *available at* bit.ly/2V6X3UP (last visited Sept. 23, 2021).

317.    Many experts believe that the solution to "breakthrough" cases (individuals who become infected after vaccination or reinfection) is treating patients with a therapeutic intervention-not mandating vaccines for everyone, which will not entirely solve the problem for everyone.

### K. FDA Approval of Pfizer Vaccine.

318.    The Moderna and Janssen Vaccines have not received FDA approval, and are simply EUA.  Therefore, they do not provide any protection to vaccinated individuals harmed by the vaccines.  The Pfizer vaccine that is currently available to the Plaintiff employees, does not have FDA approval either.

319.    The EUA statute, 21 U.S.C. § 360vvv-3, explicitly states that anyone to whom the product is administered must be informed of the option to accept or to refuse it, as well as the alternatives to the product and the risks and benefits of receiving it.

### L. Government Action.

320.    The Healthcare Defendants are all healthcare entities that receive money from the Federal Government.

321.    The CDC Measure Specification placed conditions upon the Defendant health care entities' right to receive the government money.

322.    In order to comply, Plaintiffs have to take the vaccine by as early as October 1, 2021.

323.    There are severe consequences to those who refuse the vaccine and do not receive an exemption—including termination of employment.

### M. Exemptions.

324.    Under the Health Care Defendants' Vaccine Mandate Policies, individuals may request an exemption from the Vaccine Mandate Policies.  However, in practice, the exemptions are extremely limited and contain a narrow set of criteria relating to religious, disability, and other medical issues.  Even where an exemption is granted, there is no guarantee that the exemption will not be withdrawn at a later date.

325.    The Vaccine Mandate Policies do not include an exemption for those with natural immunity to COVID, including those who have previously been infected and fully recovered, or those with certain medical conditions where the Covid-19 vaccination is contra-indicated, even under the physician's advice.

### Claims for Relief

### COUNT I

### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb

326.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

327.    The Plaintiffs' sincerely-held religious beliefs prohibit them from the Covid-19 vaccination.

328.    The Plaintiffs' objections to the Covid-19 vaccination are religious.

329.    The Plaintiff exercise religion within the meaning of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA").

330.    The CDC Measure Specification, which caused the Health Care Defendants' Vaccination Mandates, coerces the Plaintiffs to change or violate their sincerely-held religious beliefs by requiring their employers to report them as a part of the denominator under the CDC Measure Specification.

331.    The CDC Measure Specification chills the Plaintiffs' religious exercise.

332.    The CDC Measure Specification coerces the Plaintiffs to violate their sincerely-held religious beliefs, in that the CDC Measure Specification coerces the Plaintiffs to take the Covid-19 vaccination despite their religious-based objections.

333.    The CDC Measure Specification exposes Plaintiffs to loss of employment and to significant disputes with their employer over their religious objections to the Covid-19 vaccinations.

334.    The CDC Measure Specification pressures the Defendant Health Care Providers into pressuring the Plaintiffs to take the Covid-19 vaccination because, if they do, the employers' vaccination rates will increase and that will be reported to the HHS under the CDC Measure Specification and will result in higher Medicare reimbursements.

335.    The Vaccine Mandate Policies compel Plaintiffs to exercise a "Sophie's Choice," remain true to their religious convictions or adhere to the CDC Measure

Specification and consent to injection of the Covid-19 vaccination into their bodies in violation of their religious convictions.

336.    The CDC Measure Specification imposes a substantial burden on the Plaintiffs and on their exercise of religion.

337.    The CDC Measure Specification furthers no compelling government interest.

338.    The CDC Measure Specification is fatally under-inclusive as it is far short of a national vaccination requirement—only applying to health care personnel.

339.    The CDC Measure Specification is not narrowly tailored to any compelling government interest.

340.    The CDC Measure Specification is not the least restrictive means of furthering Defendants' alleged interests.  For example, Covid-19 testing and quarantine of infected persons can be used in lieu of mandatory vaccinations to protect the public health.

341.    The CDC Measure Specification violates Plaintiffs' rights secured to them by RFRA.

342.    The Plaintiffs request from the Court a declaratory judgment and injunction against the CDC Measure Specification because it violates RFRA.

## COUNT II

**Violation of the Plaintiff Employees' Civil Rights Under 42 U.S.C. §1983 – Violation of the Free Exercise Clause of the First Amendment to the United States Constitution**

343.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this complaint as though fully set forth herein.

344.    Plaintiffs sincerely-held religious beliefs prohibit them from Covid-19 vaccinations.

345.    When Plaintiffs object to the Covid-19 vaccination, they are exercising their right to practice their religion within the meaning of the Free Exercise Clause of the First Amendment.

346.    The CDC Measure Specification is not neutral and is not generally applicable.

347.    The CDC Measure Specification has created categorical and individualized denominator exclusions to the CDC Measure Specification but not for religious objectors.

348.    The CDC Measure Specification, which causes the Health Care Defendants' Vaccination Mandates, coerces Plaintiffs to change or violate sincerely-held religious beliefs.

349.    The CDC Measure Specification coerces Plaintiffs to change or violate their sincerely-held religious beliefs by requiring their employers in order to successfully participate in federal subsidies to report to the HHS employee vaccination rates including religious objectors in the denominator.

350.    The CDC Measure Specification chills the Plaintiffs' religious exercise.

351.    The CDC Measure Specification coerces Plaintiffs to violate their sincerely-held religious beliefs, in that the CDC Measure Specification coerces the Plaintiffs, through their respective employers, to accept the Covid-19 vaccination.

352.    The CDC Measure Specification exposes Plaintiffs to loss of employment and to significant disputes with their employer over their religious objections to the Covid-19 vaccinations.

353.    The CDC Measure Specification pressures the Plaintiffs to take the Covid-19 vaccination because, if they do, the employers' vaccination rates will increase and that will be reported to the HHS under the CDC Measure Specification.

354.    So, the Plaintiffs are faced with a choice of remaining true to their religious convictions or adhering to the CDC Measure Specification and taking the Covid-19 vaccination in contradiction of their religious convictions.

355.    The CDC Measure Specification imposes a substantial burden on the Plaintiffs and on their exercise of religion.

356.    The CDC Measure Specification furthers no compelling government interest.

357.    The CDC Measure Specification is fatally under-inclusive as it is far short of a national vaccination requirement—only applying to health care personnel.

358.    The CDC Measure Specification is not narrowly tailored to any compelling government interest.

359.    The CDC Measure Specification is not the least restrictive means of furthering Defendants' alleged interests.  For example, Covid-19 testing and quarantine can be used in lieu of mandatory vaccinations to protect the public health.

360.    The CDC Measure Specification violates Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

361.    The Plaintiffs request from the Court a declaratory judgment and injunction against the CDC Measure Specification because it violates the First Amendment's Free Exercise Clause.

## Count III

### Unilateral Employer Vaccination Mandate in Minnesota is Void as Illegal or Against Public Policy under Minn. Stat. § 12.39

362.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this complaint as though fully set forth herein.

363.    Defendants' coercive Policy violates Minn. Stat. § 12.39 which states:

  a.    "… individuals have a fundamental right to refuse medical treatment, testing, physical or mental examination, vaccination, participation in experimental procedures and protocols, …".  Subd. 1.

  b.    Further, "before performing … vaccination of an individual … a health care provider shall notify the individual of the right to refuse the … vaccination, …".  Subd. 2.

364.    The section is part of Minn. Stat. ch. 12, which has the official title "Minnesota Emergency Management Act of 1996." *Minn. Stat. § 12.01*. The chapter contains a definition section, Minn. Stat. § 12.03, and it defines "emergency" to mean "an

unforeseen combination of circumstances that calls for immediate action to prevent a disaster from developing or occurring," Minn. Stat. §12.03, subd. 3.

365.   Therefore, if the state cannot require vaccination even as a response "to a national security emergency or peacetime emergency,"[18] then, *a fortiori*, the state cannot require vaccination through some measure that is not a response "to a national security emergency or peacetime emergency."

366.   Defendants are not allowed under Minnesota law to require Plaintiffs to submit to a vaccination, and further the Defendants are obligated to "notify" their employees that they have "the right to refuse the ... vaccination."  Defendants are violating this by requiring their employees to get a vaccine, or coercing them to get a vaccine, by threatening that they will be terminated or forced into an unpaid leave of absence if they refuse.

367.   Defendants' Mandate Policies violate Minnesota's Refusal of Treatment Law.

368.   The Vaccine Mandate Policies not only require the vaccination, but require the employee to prove his or her COVID immunization statutes.

369.   Every employee who does not accept the vaccination will either be terminated or will suffer other negative consequence such as submitting to frequent testing, wearing a mask, or social distancing.

370.   The employer Mandates violate Minnesota Refusal of Treatment Law.

---

[18] Governor Walz ended Minnesota's "peacetime emergency" on June 30, 2021.  That "peacetime emergency" had been in place since March 2020.

371.    The employers have unilaterally imposed the vaccination requirement on the employees under threat of termination.

372.    Under Minnesota common law of contracts, the employers' unilateral vaccination requirement is void as it violates Minn. Stat. § 12.39 and it violates the public policy enacted therein.

373.    Minn. Stat. § 12.39 states that individuals in Minnesota have a right to refuse "vaccination."

374.    Minn. Stat. § 12.39 reflects Minnesota's public policy that individuals in Minnesota have a right to refuse "vaccination."

375.    The employers' unilateral vaccination requirements violate the Plaintiffs' fundamental rights under Minn. Stat. § 12.39 to refuse vaccination.

376.    Since the employers' unilateral vaccination requirements imposed on Plaintiffs violate Minn. Stat. § 12.39 and public policy, the employers' unilateral vaccination requirements are void.

377.    The Plaintiffs seek a declaratory judgment and related injunction against the Health Care Defendants' imposition of unilateral vaccination requirements because they are void as violating Minn. Stat. § 12.39 and public policy.

## Count IV

**The Defendants' Mandates Violates the Fourteenth Amendment Liberty Interest.**

378.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

379.    Defendants' Vaccine Mandate Policies violate the liberty individual interest protected by the Fourteenth Amendment to the U.S. Constitution, which includes rights of personal autonomy and bodily integrity, *see, e.g.*, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, (1905), and the right to reject medical treatment, *Cruzan v. Director, Missouri Dep't Health*, 497 U.S. 261 (1990); *Washington v. Harper*, 494 U.S. 210, 229 (1990) (a "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]"

380.    Personal autonomy and bodily integrity include the right to refuse unwanted and medically unnecessary medical care.  This right to "refus[e] unwanted medical care," (Cruzan) is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment."  Washington v. Glucksberg, 521 U.S. 702, 722 n. 17 (1997).   The right to refuse medical care derives from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." Vacco v. Quill, 521 U.S. 793, 807 (1997).

381.    Sometimes Jacobson has been thought to authorize near carte blanche authority for government to mandate vaccinations in response to pandemics on the basis that such individual liberty must yield to the common good—all with great deference to legislatures and consideration of little or no evidence to the contrary in reaching their decisions.  Therefore, cases entitled to higher scrutiny have instead received great deference. But *Jacobson* was not absolute *carte blanche* because it recognized an exception where rights are violated or a mandate is unreasonable for not advancing health:

72

> If there is any … power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, [1] has no real or substantial relation to those objects, or [2] is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 31 (citations omitted).

382.   Further, Smallpox (the disease to which *Jacobsen* related) possessed an over a fifty percent (50%) fatality rate for victims between the ages of 30 and 60, a vast departure from the minute fatality percentages noted above.  When the risk of harm to the public is of that magnitude, scrutiny of the infringement of constitutional rights is necessarily relaxed.

383.   Because mandated vaccinations are a substantial burden and the risk of death from Covid-19 is comparatively small, Defendants must prove narrow tailoring to a compelling interest that *justifies mandatory vaccinations*, not a more general interest. But while government may have a general interest in mitigating Covid-19, the following problems reveal no narrow tailoring to any compelling interest exists.  The Defendants lack any uniqueness to justify doing so.  Plaintiffs with their natural immunity have very low risk for serious Covid-19 illness; so, Defendants lack an interest in forcing vaccinations for such risks. Plaintiffs pose little risk of Covid-19 transmission to the surrounding employees or patients.  *Id.*  Naturally acquired immunity from Covid-19 is as robust as, or more than, vaccine-acquired immunity, Part I.D.4., so there is no compelling interest in vaccinating those who have had COVID-19. Given natural and vaccine

immunity, there is de facto Covid-19 herd immunity. *See generally* Parts I.C. and I.D.

Therefore, Defendants have no compelling interest in mandating vaccination.

384.   The same evidence establishes that, even if there were a compelling interest

in mandating vaccinations, Defendants' Mandates are not narrowly tailored to such an

interest. For example, a blanket mandate ignores individual factors increasing (older age,

co-morbidities) or decreasing (having had Covid-19) Plaintiffs' risks to themselves or to

others. Mandating vaccines for all is the sort of blunt rule, perhaps appropriate at the

beginning of a pandemic, but not when the pandemic has faded and much more is known

about the risks in light of available treatments and studies.

385.   Furthermore, Defendants' Mandates fail modern rational basis scrutiny and

under *Jacobson*'s exemption, since the Mandates are "unreasonable" and "has no real or

substantial relation" "to protect[ing] the public health." 197 U.S. at 31, *i.e.*, it goes

"beyond what [i]s reasonably required for the safety of the public," *id* at 28. The same

evidence that shows there is no compelling interest or narrow tailoring with Defendants'

Mandates show that it fails even under *Jacobson*.

386.   In sum, Defendants' Mandates are unconstitutional under both current

strict-scrutiny jurisprudence and *Jacobson*'s exception.

387.   As a result, Defendants' Mandates violate Plaintiffs civil rights under 42

U.S.C. §1983.

**Count V**

**Violation of Title I of the Americans with Disabilities Act**

388.   Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

389.   The Defendant employers are "employer[s]" as defined in 42 U.S.C. § 12111.

390.   The Plaintiff employees are qualified individuals with a disability as defined in 42 U.S.C. §§ 12101 and 12111.

391.   The Defendant employers are subject to Title I of the Americans with Disabilities Act.

392.   The Defendant employers discriminated against the Plaintiff employees by threatening to terminate their employment for refusal to be vaccinated and by refusing their requests for a reasonable accommodation.

393.   The Defendant employers' actions violate Title I of the Americans with Disabilities Act of 1990 as amended.

394.   As result of the Defendant employers' illegal actions, the Plaintiff employees will suffer wage loss and loss of employment benefits if they are terminated.

**Count VI**

**Violation of the Minnesota Human Rights Act – Disability Discrimination**

395.   Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

75

396.    The Defendant employers are "employer[s]" as defined in Minn. Stat. §363A.03.

397.    The Plaintiff employees are and have been qualified disabled person[s] as defined in Minn. Stat. § 363A.03.

398.    The Defendant employers have refused to make reasonable accommodations with the Plaintiff employees with respect to the Plaintiff employees refusals to be vaccinated.

399.    The Defendant employers have threatened to terminate the employment of the Plaintiff employees if they refuse to get vaccinated.

400.    The Defendant employers' actions violate the Minnesota Human Rights Act.

401.    As a result of the Defendant employers' illegal actions, the Plaintiff employees will suffer wage loss and loss of employment benefits if they are terminated.

## Count VII

### Violation of the Minnesota Human Rights Act – Religious Discrimination

402.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

403.    Under the Minnesota Human Rights Act, Minn. Stat. § 363 A.01 et seq. it is unlawful to discriminate against an employee because of that employee's religion.

404.    During all relevant time periods, the Defendant employers are employers of the Plaintiff employees as that term is used in Minn. Stat. § 363A.03 (16).

76

405.    During all relevant time periods, the Plaintiff employees are employees of the Defendant employers as that term is used in Minn. Stat. § 363A.03 (15).

406.    The Defendant employers have discriminated against the Plaintiff employees because of their religion, in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 et seq. The discrimination is not based on a bona fide occupational qualification.

407.    The Defendant employers have refused to provide reasonable accommodations for the Plaintiff employees' religious practices. The Defendant employers have also taken adverse employment actions against the Plaintiff employees. The Plaintiff employees' religion was a factor that motivated these discriminatory practices.

408.    The Defendant employers were and are able to reasonably accommodate Plaintiffs' religious practices without suffering any undue hardship on the conduct of their business.

409.    The Defendant employers have intentionally engaged, and continue to intentionally engage, in the unlawful employment practices described above.

410.    As a direct result of Defendant employers' unlawful conduct, the Plaintiff employees have suffered and will continue to suffer a loss of past and future income and employee benefits, mental anguish, emotional distress, humiliation, embarrassment, and other damages.

## Count VIII

## Violation of the Minnesota Human Rights Act – Pregnancy Discrimination

411.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

412.    The Minnesota Human Rights Act, Minn. Stat. §363A.08, prohibits an employer from discriminating against an employee "because of such individual's…sex."

413.    For purposes of Minn. Stat. §363A.08, the term "sex" includes because of pregnancy, childbirth, or related medical conditions."

414.    Therefore, Minn. Stat. §363A.08 prohibits an employer from discriminating against an employee because of the employee's pregnancy.

415.    Minn. Stat. §363A.08 prohibits both disparate treatment of pregnant employees and employer policies that have a disparate impact on pregnant employees.

416.    At least one of the Plaintiffs—Mary Roe 143—is currently pregnant.

417.    Title VII thus protects Mary Roe against employment discrimination because of her pregnancy.

418.    The COVID vaccines pose special risks for pregnant women and for their unborn children.

419.    An employer's requirement that employees get vaccinated thus discriminates against pregnant employees because the requirement places a risk burden on pregnant employees not placed on other employees.

420.    An employer's requirement that employees get vaccinated constitutes both disparate treatment of pregnant employees and a policy that has a disparate impact on pregnant employees.

421.    Business necessity does not justify a Vaccine Mandate Policy's disparate impact on pregnant employees.

422.    The Vaccine Mandate Policies thus constitute sex discrimination that violates Minn. Stat. §363A.08.

## Prayer for Relief

Therefore, the Plaintiffs respectfully ask that this Court:

1.  Declare the CDC Measure Specification as violating RFRA and the U.S. Constitution;

2.  Declare Defendants' Mandates unconstitutional on their face;

3.  Declare Defendants' Mandates unconstitutional as applied to each Plaintiff;

4.  Declare Defendants' Mandates in violation of Minn. Stat. § 12.39;

5.  Declare Defendants' unilateral vaccination mandates, under Minnesota common law, as void because the mandates violate Minn. Stat. § 12.39 and public policy;

6.  Enjoin Defendants from enforcing their vaccination mandates on their face or as applied;

7.  Grant Plaintiffs their costs and attorneys' fees under RFRA, the Equal Justice Act and any other applicable authority;

8.  Grant any and all other such relief as this Court deems just and equitable; and

9.  Award the Plaintiffs all costs, expenses, and expert witness fees allowed by law.

Dated: September 27, 2021                    *s/Gregory M. Erickson*
                                             William F. Mohrman, 168816
                                             Gregory M. Erickson 0276522
                                             Vincent Fahnlander, 19220X
                                             Erick G. Kaardal, 229647
                                             Mohrman, Kaardal & Erickson, P.A.
                                             150 South 5th Street, Suite 3100
                                             Minneapolis, MN 55402
                                             Telephone: 612-341-1074
                                             Facsimile: 612-341-1076
                                             Email: erickson@mklaw.com
                                             *Attorneys for Plaintiffs*